UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| GERILEE GUSTASON, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>WASHINGTON STATE DEPARTMENT<br>OF SOCIAL & HEALTH SERVICES, et al.,<br><br>        Defendants. | Case No. CV05-5117RBL |

## I.  SUMMARY

### A.   Procedural Standing

This matter is before the Court on three Motions for Summary Judgment: Plaintiffs' Motion for Partial Summary Judgment [Dkt. #40], Defendant Washington State Department of Social and Health Services ("DSHS") Second Motion for Summary Judgment [Dkt. #45], and Defendant Peninsula Regional Support Network's ("PRSN")[1] Motion for Summary Judgment [Dkt. #41].  Gerilee and Ashlee Gustason ("Plaintiffs") seek partial summary judgment on the

---

[1] All references to PRSN incorporate Clallam County, Jefferson County and Kitsap County.

ORDER- 1

issue of Defendants' alleged liability for violations of 42 U.S.C. §12132, the Americans with Disabilities Act ("ADA"); RCW 49.60.010, the Washington Law Against Discrimination ("WLAD"); and 29 U.S.C. §794, the Rehabilitation Act.[2]  Defendants seek dismissal of all claims. For the following reasons, Plaintiffs' Motion [Dkt. # 40] is DENIED and Defendants' Motions [Dkt. #s 41 and 45] are GRANTED.[3]

The case involves the relationship between DSHS and Plaintiffs regarding the adequacy of care provided to Ashlee.  In the present action, Plaintiffs assert claims which they insist are not covered by the terms of a 2002 Settlement Agreement between Plaintiffs and the Defendants to the present action.  Defendants disagree and move for summary judgment to dismiss all claims based on their assertion that such claims are precluded by the Settlement Agreement.  Defendants further argue that Plaintiffs' claims are unfounded because Ashlee participated in and benefitted from the State's long-term residential mental health program, despite Plaintiffs' decision not to utilize the ordinary avenues provided for the attainment of such services.  Finally, Defendants contend that Gerilee's claims are time barred.

**B.     Background**

Ashlee Gustason contracted spinal meningitis at 17 months of age leaving her deaf.  She was adopted by Gerilee, who is also deaf, when she was six years old.  Gerilee has experienced considerable difficulty in raising Ashlee.  In 2000, Ashlee was diagnosed with Oppositional Defiance Disorder.  She ran away on several occasions. On one such occasion in September of

---

[2]Plaintiffs claims are comprised of alleged violations of various anti-discrimination laws, namely the ADA, the Rehabilitation Act, and the WLAD.  As the elements of these claims do not differ in any respect relevant to this Order, the Court will address these claims together. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135-36 (9th Cir. 2001).

[3]The Court notes that Plaintiffs' Motion for Extension of Time [Dkt. #68] was GRANTED.  In arriving at the present decision on the parties respective motions for summary judgment, the Court considered all submitted materials.

2001, Ashlee assaulted a police officer and was placed in a juvenile detention facility.

Following four months of incarceration, Ashlee was admitted to Children's Psychiatric Unit in Seattle on a short-term basis. While there she received an evaluation resulting in a recommendation that she be admitted to a long-term residential facility with deaf peers and a staff able to communicate directly. Gerilee determined that no such facility existed in Washington. Gerilee pursued a number of possibilities in an attempt to obtain the necessary funding to send Ashlee to the National Deaf Academy ("NDA") located in Florida. Gerilee believed that the NDA was the only appropriate facility for Ashlee. After failing to acquire funding through insurance or the State, Gerilee decided to use her retirement savings to send Ashlee to the NDA.

In 2002, the Gustasons filed a complaint with the Washington State Office of Administrative Hearings, seeking reimbursement for costs associated with Ashlee's placement at the NDA. On August 1, 2002, the Gustasons and DSHS entered into a Settlement Agreement, under which the parties agreed not to revisit any "released claims." See Affidavit of H.C. Hank Balderrama, Ex. 5 ("Balderrama Aff.") [Dkt. #33]. The Agreement states in pertinent part:

> 4.1   "Released Claims" means any and all demands, obligations, actions, causes of action, rights, damages, costs (including payment of attorneys fees), claims, counterclaims, and controversies at law or in equity or otherwise, whether direct or indirect, known or unknown, that the parties now own or hold, or at any time heretofore owned or held related to mental health services provided to Ashlee Gustason at the National Deaf Academy from January 24, 2002 to June 14, 2002.

Plaintiffs contend that the Settlement Agreement does not bar the present action against Defendants. Plaintiffs ground this contention on their insistence that the Settlement Agreement did not include compensation for the emotional distress suffered as a result of their dealings with Defendants. Specifically, Plaintiffs point to alleged discrimination as the direct result of their emotional distress. Conversely, Defendants argue that any such claims seeking emotional distress

ORDER- 3

compensation are covered by the terms of the Settlement Agreement.

To properly understand the positions of the parties and the legal issues at work, the Court will analyze the process through which individuals such as Ashlee ordinarily receive mental health treatment.

### 1.     Mental Health Treatment Available To Minors In Washington State[4]

The State of Washington allocates federal and state funds to Regional Support Networks ("RSNs"). Defendant PRSN is one such RSN. RSNs have a contractual obligation to provide outpatient, community-based, and short-term (17 days or less) inpatient services to mentally ill Washington State citizens who qualify for public assistance. Declaration of Carrie Bashaw ("Bashaw Decl.") [Dkt. #55]. Mentally ill children who qualify for long-term inpatient care receive such services through Washington's Children's Long-term Inpatient Program ("CLIP"). The CLIP Administration is responsible for policy and clinical decision-making regarding admission to Washington's five CLIP programs. There are two primary ways for a child in Washington to qualify for state-funded long-term inpatient services.

The first way to obtain state-funded long-term inpatient services is through the voluntary admission process. The process begins when an RSN either prepares or reviews a submitted application. Following an assessment of the application, the RSN agrees or declines to make a referral to the CLIP Administration. Applicants are free to appeal any referral determination made by an RSN. The CLIP Administration then reviews all information provided and determines whether long-term inpatient care is medically necessary. Applicants must be unanimously approved to receive such services. A finding of medical necessity requires a determination by the

---

[4] The information in this section was garnered primarily from the Intersystem Working Agreement between the PRSN and the Children's Long-term Inpatient Program ("CLIP") and the policies and procedures of the CLIP administration. Declaration of Kathleen Crane, Exs. 1-3 [Dkt. #58].

CLIP Administration that the child suffers from a severe psychiatric impairment.[5]  If a voluntary application is approved, the CLIP Administration identifies the appropriate state-funded long-term inpatient CLIP program that can meet the child's needs.  Children are not sent to out-of-state programs.  If there is not a CLIP facility capable of providing reasonable accommodations, arrangements are made to tailor services to meet the child's needs.  Declaration of Kathleen Crane ("Crane Decl.") [Dkt. #58].

The second way for a child to obtain state-funded long-term inpatient services is through the involuntary civil commitment process pursuant to a court order.  This process begins only after a child has been involuntarily committed to an Evaluation and Treatment ("E&T") Center for short-term care.  E&T staff might determine that long-term care is needed, in which case the local county court is petitioned for a long-term involuntary commitment order.[6]  If a court order for long-term civil commitment is obtained, the CLIP Administration is notified.  The CLIP Administration then makes an assignment to the most appropriate CLIP program, or advocates for a less restrictive alternative.  In the event a court order mandates a 180 day commitment, the child becomes automatically eligible for admission to a CLIP program.

The CLIP Administration never received an application from Plaintiffs for voluntary state-funded long-term inpatient mental health treatment.  Bashaw Decl., Ex. 2, pp. 23, 25.  Moreover, the CLIP Administration has never received a notice from an E&T Center, PRSN, or a court indicating that Ashlee Gustason was civilly and involuntarily committed for state-funded long-term inpatient mental health care.  Crane Decl.

---

[5]Other than the CLIP Administration, there is no other State entity or person authorized to accept or deny applications for voluntary admission for long-term inpatient care for severely psychiatrically impaired children.

[6]An involuntary civil commitment order for long-term inpatient care requires a court to reach a finding that the child is a danger to self or others or is gravely disabled.  RCW 71.34.740.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## III.  DISCUSSION

### A.     Settlement Agreement

Plaintiffs contend that the present action seeking compensation for emotional distress resulting from Defendants' alleged discrimination is not barred by the Settlement Agreement.  Defendants argue that such claims were contemplated by the terms of the Settlement Agreement and are clearly "related to...[placement] at the National Deaf Academy."  Defendants further maintain that the present action is unauthorized by the Settlement Agreement, as it was not "expressly excepted [therein]."  Balderrama Aff., Ex 5, ¶2.0.

In interpreting the terms of a settlement agreement, courts are to apply the applicable state's principles under contract law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).

Interpretation of a settlement agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn. *Berg v. Hudesman*, 115 Wn.2d 657, 667-669 (1990).  However, the interpretation of unambiguous terms of a contract is a question of law.  *Paradise Orchards General P'ship v. Fearing*, 122 Wn.App. 507, 517 (2004).

In the Order Denying Defendants' [First] Motion for Summary Judgment [Dkt. #51] the Court stated its belief "that both parties assert a reasonable interpretation of the Settlement Agreement, presenting a material issue of fact."  The Court's previous ruling was based on the possibility that new and distinct claims could have arisen after the date of the Settlement Agreement.  At this time, it is evident to the Court that Plaintiffs are unable to make a showing that any such distinct claims exist.  Instead, it is apparent the Plaintiffs seek to recover in this action damages for emotional distress they allegedly suffered previously.  Such claims were unambiguously within the scope of the claims resolved by the Settlement Agreement.

Counsel for both parties exchanged letters in an attempt to clarify the scope of the Settlement Agreement.  In a letter dated June 4, 2002, Assistant Attorney General Eric Nelson stated that Defendants understood the Settlement Agreement "to release [DSHS] and [PRSN] from all claims under the Americans with Disabilities Act, or any other theory, for allegedly wrongful decisions regarding Ashlee's 2002 placement at the NDA."  Declaration of Lonnie Davis, Attached Ex. [Dkt. #35].  Plaintiffs executed the Settlement Agreement on August 1, 2002, without responding to Defendants' June 4, 2002 letter, or otherwise contending that Defendants' position was inconsistent with Plaintiffs' understanding of the Settlement Agreement. In any event, it is apparent that Plaintiffs' claims in this action clearly fall under the broad definition of "released claims" under paragraph 4.1.  As such claims were "related to...[placement] at the National Deaf Academy" and were not "expressly excepted" in the Settlement Agreement,

they must be dismissed as a matter of law. Additionally, it is less than clear that a claim for emotional distress damages was ever recoverable. This is due to the fact that Plaintiffs never employed the procedures provided for Ashlee to attain the qualification necessary to receive state-funded long-term residential treatment. As a matter of law, the Settlement Agreement releases Defendants from the claims asserted by the Plaintiffs in this action.

### B.  Application Of Anti-Discrimination Laws

To establish a violation of anti-discrimination laws, Plaintiffs must demonstrate that (1) Ashlee is a qualified individual with a disability; (2) the Defendants are subject to the anti-discrimination laws; and (3) Ashlee was denied the opportunity to participate in or benefit from Defendants' services, programs, or activities, or was otherwise discriminated against by Defendants, by reason of the disability. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135-36 (9th Cir. 2001); 42 U.S.C. §12132; 29 U.S.C. §794; RCW 49.60.030(1)(b). Because Plaintiffs declined to utilize the ordinary avenues available for the attainment of state-funded mental health services, Defendants were unable to fulfill their statutory obligations. Specifically, Plaintiffs' unilateral decision to send Ashlee to the NDA prevented Defendants from (1) reaching a final determination regarding Ashlee's qualification for services and (2) providing her with an opportunity to participate in or benefit from state-funded services, programs or activities.

#### 1.  Entitlement To Services For Qualified Individuals With A Disability As Defined By Anti-Discrimination Law[7]

As a deaf individual, Ashlee undoubtedly has a disability. No legitimate argument can be made that Ashlee is not a disabled person as defined by 42 U.S.C. §12102. But as outlined in the preceding analysis of mental health treatment available to minors in Washington, there are a variety

---

[7]State Defendants pursue this argument in their Response to Plaintiffs' Motion for Summary Judgment. They adopt a contrary position at page seven of their Second Motion for Summary Judgment. State Defendants do not explain this inconsistency.

ORDER- 8

of potential services and treatment options.  The services to which a particular citizen is entitled is dependent upon their qualification.  The phrase "qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services... ."  42 U.S.C. §12131(2); *Wilson by Hinn v. State of N.C.*, 981 F. Supp. 397, 399 (E.D.N.C. 1997).  A determination of the appropriate services and the means by which they are administered is dependant upon the qualification result.  The qualification process is exhaustive, as it "necessarily involves a determination of whether the applicant could have gained access to the program if the recipient of funds had made reasonable accommodations."  *Id., citing Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1014 (3rd Cir. 1995).

   Gerilee acknowledges that she made the decision to send Ashlee to the NDA prior to the completion of the evaluation process for in-state services.  Declaration of Duncan K. Fobes, Ex. 2, pp. 9-10 ("Fobes Decl.") [Dkt. #43].  Ashlee did receive an evaluation from Children's Hospital suggesting that she could significantly benefit from long-term residential placement in a facility with deaf peers and a staff able to communicate directly.  Affidavit of Kimberly Frinell, Ex. 3 ("Frinnel Aff.") [Dkt. #48].  However, the evaluation did not indicate that Ashlee was severely psychiatrically impaired, gravely disabled, and/or a danger to self or others.  Id.  The evaluation did not constitute automatic qualification for long-term residential placement.  The CLIP administration, upon receipt of a referral from PRSN, must reach a finding of medical necessity in order to establish qualification.  Should the CLIP administration reach a finding of medical necessity, they are then obligated to make reasonable accommodations[8] capable of meeting Ashlee's needs and allowing her to benefit equally from the public entity's services.  28 C.F.R.

---

   [8]Reasonable accommodations are discussed in greater detail below.

§35.130, subsections (b)(1)(ii)-(b)(1)(iv) and (b)(7); Crane Decl., Exs. 1-3.

Gerilee determined the NDA was the appropriate placement for Ashlee, and unilaterally made the decision to send Ashlee to the NDA before Defendants reached a final decision regarding her treatment. Fobes Decl., Ex. 2, pp. 9-10. However, the anti-discrimination laws at issue here do not require the public entity to provide the precise accommodations requested, or an accommodation that is not independently reasonable. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999) ("[The] state's responsibility, once it provides ... treatment to persons with disabilities, is not boundless.").

### 2. Long-Term Residential Treatment For A Qualified Individual

As an introductory matter, PRSN is not responsible for providing long-term residential treatment. Bashaw Decl., Ex. 2. The role of PRSN with respect to long-term residential treatment is limited to the referral of qualified individuals. Crane Decl.; WAC 388-865-0229. Plaintiffs' claims are based on alleged shortcomings in the residential treatment available to Ashlee. Since PRSN has no obligation to provide Ashlee with long-term residential treatment, the Court will focus the following analysis on the State Defendants. The State is responsible for providing reasonable long-term residential treatment accommodations through CLIP. Bashaw Decl.; Crane Decl.

One of the requirements for establishing a violation of anti-discrimination law is a showing that Plaintiffs were denied the opportunity to participate in or benefit from Defendants' services, programs, or activities, or were otherwise discriminated against by Defendants, by reason of disability. *Duvall* at 1135. Defendants must provide "equal" benefit of their programs. 28 C.F.R. §35.130, subsections (b)(1)(ii)-(b)(1)(iv). Plaintiffs shoulder the burden of demonstrating that Ashlee could not receive equal benefit from the State's long-term residential treatment program. *See Memmer v. Marin County Courts*, 169 F.3d 630, 633 (9th Cir. 1999) (plaintiffs must establish

the existence of specific reasonable accommodations the public entity failed to provide) (citations omitted).

The facts of this case show that neither the State nor PRSN were afforded a full opportunity to provide Ashlee with "equal" benefit.  As previously detailed, there are two primary methods by which children in Washington qualify for and receive state-funded long-term inpatient services.  These two processes are voluntary application and involuntary commitment.  Plaintiffs did not employ either process, instead taking unilateral action to enroll Ashlee in the NDA.  Fobes Decl., Ex. 2, pp. 9-10.

Gerilee made the decision to send her daughter to the NDA after determining that no adequate facility was available in Washington.[9]  Id.  However, the absence of a specialized facility capable of meeting Ashlee's needs does not necessarily preclude the State from providing the requisite reasonable accommodations under anti-discrimination law.  An implementing regulation of the ADA states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity."  28 C.F.R. §35.130(b)(7).  The State contends that if given the opportunity, the CLIP administration would have made the necessary modifications to provide Ashlee with a legally acceptable reasonable accommodation.  Crane Decl., p. 5; Bashaw Decl., Ex. 4.

---

[9]Plaintiffs appear to complain that Defendants were not timely in making their qualification determination.  To the extent that Plaintiffs are complaining of a delay in services, the Court notes that Ashlee was incarcerated for nearly four months prior to her departure to the NDA.  During that period of incarceration she was not eligible for state-funded long-term residential treatment.  Crane Decl.; Fobes Decl., Ex. 7.  Furthermore, Gerilee acknowledges that the evaluation and qualification process was delayed by other matters beyond Defendants' control.  Fobes Decl., Ex. 2, pp. 11-12.

ORDER- 11

Additionally, the State contends that there is no law requiring it to either develop an inpatient facility to serve only the hearing impaired or to send citizens out-of-state in the absence of such a facility.  DSHS is not permitted to retain funds for the purpose of paying for out-of-state mental health services.  Declaration of Wendy Gunther ("Gunther Decl.") [Dkt. #57].  Washington law directs the distribution of funds for long-term mental health treatment exclusively to facilities in Washington.  RCW 71.34.390.

 Besides being contrary to Washington law, the expenditure of funds for out-of-state mental health services would constitute the sort of fundamental alteration deemed unnecessary by 28 C.F.R. §35.130(b)(7).  The State argues, and the Court is persuaded, that any requirement to build an inpatient facility to serve only the hearing impaired or to send citizens out-of-state in the absence of such a facility would "fundamentally alter the nature of the services, program or activity."  Such a fundamental alteration goes beyond the required reasonable modification mandated by 28 C.F.R. §35.130(b)(7).

### 3. Provision Of A Program Able To Meet Ashlee's Disability Needs

As previously addressed, anti-discrimination laws prohibit Defendants from excluding a disabled individual from participation in, or denying the individual the benefit of, any programs, services, or activities.  42 U.S.C. §12132; 29 U.S.C. §794; RCW 49.60.030(1)(b).  Defendants must make reasonable accommodations in order to facilitate equal accessibility for qualified individuals with disabilities. 28 C.F.R. §35.130(b)(7).  In order to achieve this end, Defendants are allowed to provide different or separate services where doing so is necessary to provide the disabled person with equal services.  28 C.F.R. 35.130(b)(1)(iv); 45 C.F.R. 84.4(b)(1)(iv).  None of the anti-discrimination statutes contain a prohibition against the provision of services at an out-of-state location.

Despite the fact that Plaintiffs did not utilize the established channels available for attaining

mental health treatment, Ashlee ultimately was able to benefit from a program able to meet her disability needs. Ashlee received treatment at the NDA in Florida. Frinell Aff., Ex. 13, p.19. Plaintiffs acknowledge that the treatment Ashlee received at the NDA was "the right treatment at the right time." Frinell Aff., Ex. 2, pp. 75-76. Defendants paid for the services Ashlee received at the NDA. Balderrama Aff., Ex 2. Through her state-funded attendance at NDA, Ashlee was able to benefit from a program able to meet her disability needs.

### C.     Statute Of Limitations[10]

In determining the applicable statute of limitations, "analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with federal policies." *Reed v. United Transp. Union*, 488 U.S. 319, 327 (1989). Washington has a three-year statute of limitations for discrimination claims. RCW 4.16.080(2). Furthermore, state law claims alleging violation of RCW 49.60 (WLAD) are subject to a 60-day tolling due to a statutory notice provision. RCW 4.92.110. The 60-day tolling statute does not apply to federal law claims. *Felder v. Casey*, 487 U.S. 131 (1988). The statute of limitations for discrimination claims begins to run when the facts that support the charge would be apparent to a similarly situated reasonable person. *Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 414 (9th Cir. 1985); *See also U.S. Oil & Refining Co. v. State Dept. of Ecology*, 96 Wn.2d 85, 91 (1981) (statue of limitations begins to run when a party has a right to apply to a court for relief).

Defendants argue in their respective Motions for Summary Judgment that Gerilee's claims are time-barred. Viewing the facts in the light most favorable to Plaintiffs, the record shows that the limitations period began to run no later than January 7, 2002. On that date a meeting was held to discuss treatment options for Ashlee. Fobes Decl., Ex. 2, pp. 9-10. Gerilee claims that at this

---

[10]The following statute of limitations analysis is inapplicable to Ashlee Gustason, who was still a minor at the time this action was filed.

meeting Defendants expressly denied payment for out-of-state long-term residential treatment. Id. at 14. Therefore, the facts supporting Plaintiffs' discrimination claim would have been apparent to a similarly situated reasonable person no later than January 7, 2002.

In this action Gerilee has brought three discrimination claims against each Defendant: one state law claim (WLAD) and two federal law claims (ADA and Rehabilitation Act). With respect to the state law claims, the limitations period began to run on January 7, 2002 and expired three years and 60 days later on March 7, 2005. Gerilee's state law claim benefits from the 60-day tolling provision required by RCW 4.92.110. The analysis of Gerilee's federal law claims differs, as they do not benefit from the 60-day tolling provision under RCW 4.92.110. The limitations period for Gerilee's federal claims began to run on January 7, 2002 and expired three years later on January 7, 2005.

Plaintiffs filed this action against DSHS on February 14, 2005. Complaint [Dkt. #1]. PRSN was added as a named defendant with the filing of the Amended Complaint [Dkt. #20] on August 2, 2005. An analysis of Rule 15(c) of the Federal Rules of Civil Procedure demonstrates that the addition of PRSN does not relate back to the February 14, 2005 filing date of the Complaint. Therefore the statute of limitations analysis differs as to DSHS and PRSN.

### 1. Statute Of Limitations As To DSHS

The limitations period for Gerilee's state law claim against DSHS expired on March 7, 2005. Since this action was filed February 14, 2005, Gerilee's state law claim against DSHS is not time barred. The limitations period for Gerilee's federal claims against DSHS expired on January 7, 2005. Because Gerilee did not bring this action on or before January 7, 2005, her federal claims against DSHS are time barred.

### 2. Statute Of Limitations As To PRSN

The Court must consider the relation back doctrine under Rule 15(c) of the Federal Rules

of Civil Procedure to determine whether the addition of the originally unnamed PRSN dates back to the filing of the original complaint.  *Iwai v. State*, 76 Wn.App. 308, 312 (1994), *aff'd*, 129 Wn.2d 84 (1996).  In order to justify application of the relation back doctrine, Plaintiffs must establish that PRSN "knew or should have known that, but for a mistake concerning the identity of the proper party the action would have been brought against [PRSN]." Fed.R.Civ.P. 15(c)(3)(B); *Louisiana-Pacific. Corp v. ASARCO, Inc*., 5 F.3d 431, 434 (9th Cir. 1993).  Plaintiffs must demonstrate that they "made a mistake of identity in failing to sue [PRSN]."  *Louisiana-Pacific. Corp v.* at 434.  Where a conscious decision is made to sue another, there is no mistake of identity and the relation back doctrine does not apply.  *Id*.; *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1503 (9th Cir. 1994).  Plaintiffs have failed to offer sufficient justification to support application of the relation back doctrine.  Therefore all claims against PRSN are considered filed August 2, 2005, by which time the limitations period had run on Plaintiffs' state and federal discrimination claims.  All claims against PRSN are time-barred.

### IV.  CONCLUSION

A consideration of all of the facts and legal theories before the Court demonstrates that the present action is related to Ashlee's placement at the NDA.  Therefore, the Settlement Agreement releases Defendants from all claims asserted by Plaintiffs in this action.  Furthermore, because Plaintiffs never submitted a voluntary application for long-term inpatient treatment and Ashlee was not involuntarily committed, the Defendants' failure to provide services for which there was no formal qualification is not discriminatory as a matter of law.  Finally, the applicable statute of limitations bars all of Gerilee's claims, with the exception of her WLAD claim against DSHS.

\* \* \*

The Court DENIES Plaintiffs' Motion for Partial Summary Judgment [Dkt. #40],

GRANTS Defendant Washington State Department of Social and Health Services ("DSHS") Second Motion for Summary Judgment [Dkt. #45], and GRANTS Defendant Peninsula Regional Support Network's ("PRSN") Motion for Summary Judgment [Dkt. #41].  Therefore, Plaintiffs' claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED this 6th day of April, 2006.

                     /s/ Ronald B. Leighton
                     RONALD B. LEIGHTON
                     UNITED STATES DISTRICT JUDGE